## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

        Plaintiff,

   vs.

PAUL M. DAUGERDAS, ERWIN MAYER,
DONNA GUERIN, DENIS FIELD, ROBERT
GREISMAN, RAYMOND CRAIG
BRUBAKER, and DAVID PARSE,

       Defendants.

CASE NO. 09-581 (WHP)

## <u>SENTENCING MEMORANDUM OF ERWIN MAYER</u>

**JONES DAY**
Daniel E. Reidy
Thomas P. McNulty
Erin L. Shencopp
(admitted pro hac vice)
77 W. Wacker Dr., Suite 3500
Chicago, IL 60601

## INTRODUCTION

Erwin Mayer will stand before this Court on July 30, 2014 to be sentenced for his role in a conspiracy to defraud the Internal Revenue Service and evade the payment of taxes.  Mr. Mayer previously stood before this Court on October 19, 2010, pleaded guilty, and took responsibility for his actions.  He has shown deep remorse and worked hard to make amends by providing "extraordinary substantial assistance" to the Government in prosecuting his co-defendants.  (Government's Sentencing Mem. at 2.)   In its Sentencing Memorandum, the Government described Mr. Mayer as "the most important cooperator in this case," whose cooperation "constituted critical assistance" and "proved instrumental to the convictions obtained at trial." (*Id.* at 5.)

Mr. Mayer respectfully and humbly asks the Court, in determining a just sentence, to consider not only the conduct that has brought him to this place, but also what he has done to make amends for his actions, the unlikelihood that he would ever commit a criminal act again, and what the sentence will mean for his family.  In addition to pleading guilty, Mr. Mayer has provided critical assistance to the Government in prosecuting his co-defendants and in pursuing civil actions against taxpayers and promoters who benefited from fraudulent tax shelters.  Mr. Mayer testified for 17 days in two criminal trials, and he also spent thousands of hours meeting with the Government to share his knowledge of the conspiracy, researching discovery documents and databases to help support the Government's case, and untold hours reviewing and preparing exhibits for the Government to use at trial and otherwise.  His testimony was instrumental in securing convictions and pleas of multiple defendants.  Mr. Mayer's cooperation has been complete, punctiliously thorough and honest from the beginning and throughout, extraordinary and vast in scope, and substantial in terms of outcome.

Mr. Mayer understands the seriousness of his conduct and feels great shame and remorse for what he has done.  While Mr. Mayer's age and the fact that he can no longer practice law strongly suggest that he will not re-offend, the simple fact is that he would never choose to put himself and his family in this situation ever again.  Mr. Mayer's indictment, his involvement in criminal and civil legal proceedings over the course of 12 years, the forfeiture of over $11.2 million, including the loss of family homes, the pain and suffering he has caused his children, wife, parents, and other family, and the shame of his dishonesty all serve as punishment in its own right, and as deterrents for any future criminal conduct.

While Mr. Mayer accepts that he is guilty of serious crimes, imprisonment will further burden his family.  Mr. Mayer, his wife, and children are a tight-knit family who draw on each other for love, support, and assistance in the everyday activities of their lives. ████████████ ███████████████████████████████████████████████████████████████████ ██████████████████████████████████████████ Mr. Mayer also is the prime caretaker for his elderly parents.  He helps manage their finances, their bills, and helps maintain their home. ████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████ █████████████████████████████████████████ It will be very difficult for others, who live far away or have other obligations, to step into Mr. Mayer's shoes and assist his parents in the same way. Mr. Mayer understands that he has committed serious offenses, but, on his behalf, we respectfully and humbly ask for a sentence of probation in light of his extraordinary cooperation, his current circumstances, and his family's needs.

I.      **FACTUAL BACKGROUND**[1]

    A.      **Mr. Mayer and His Family**

Mr. Mayer is a first-generation American whose parents emigrated from Europe after having survived World War II.  He grew up in Mount Prospect, Illinois, with modest means.  His father was a cabinet maker and his mother largely stayed home to raise Mr. Mayer and his younger brother.  Mr. Mayer's parents provided a loving environment for their children growing up, and also stressed the importance of family bonds, hard work, learning, and integrity.

Mr. Mayer's path to becoming a lawyer was not an easy one.  Mr. Mayer was raised in a predominantly German-speaking home, and he had to learn English outside the home.  Mr. Mayer became sufficiently proficient to excel in school, and his focus, determination, and commitment allowed him to succeed academically through primary, secondary, and undergraduate schools.  Despite challenges, Mr. Mayer realized his dream of becoming a lawyer.  His acceptance into law school, graduation, and passing the bar exam were proud and memorable days for Mr. Mayer and his family.

While Mr. Mayer placed importance on his career, he has always been, first and foremost, a family man.  Mr. Mayer has been married for nearly 25 years and he and his wife will celebrate their 25th wedding anniversary on October 28, 2014.  Mr. Mayer and his wife have three sons aged 17, 19, and 22.  Mr. Mayer is a devoted husband and father.  Mr. Mayer has strived to provide the same loving environment for his sons that he enjoyed in his youth, and to instill in his sons the importance of honesty, responsibility, and hard work.  He and his wife have cared for each other in the ups and downs of life as true partners.  ███████████████

---

[1] Unless otherwise noted, information contained in Section I can be found in attached letters in aid of sentencing (Exhibit A) and in the Presentence Investigation Report.

████████████████████████████████████████████████████

██████████████████████████████████████████████   Despite
what happened in his professional life, Mr. Mayer's wife has remained by his side and supported
him throughout this difficult time.  There was never any question that she would do otherwise.

Mr. Mayer has always been close with his parents.  In recent years, he has taken on the
critical role of caring for his parents as they have grown older.  Mr. Mayer helps manage his
parents' finances, their bills, their healthcare and insurance claims, and helps them maintain and
care for their home.  ████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████   Mr.  Mayer's  parents  have
increasingly relied on him as his father has increasingly experienced age-related memory loss.

Mr. Mayer has also been close with his brother and extended family, and generous with
his time and assistance.  Mr. Mayer's family views him as someone they can rely on and who
will help them whenever needed.  When Mr. Mayer's grandmother was no longer capable of
caring for herself, Mr. Mayer lovingly accepted responsibility for his grandmother's care,
including managing her finances and healthcare, selling her home, and transitioning her into a
nursing home where she lived to be 102 years old before her death earlier this year.

As reflected in the letters of support provided by friends and family, people who know
Mr. Mayer describe him as kind, caring, genuine, generous with this time, and trustworthy.  (*See*
Ex. A.)  Mr. Mayer hopes that his criminal actions will not define him, and that he can repair his
and his family's life.

### B.    Mr. Mayer's Conduct

Mr. Mayer's involvement in the tax shelter conspiracy has been recounted in detail before
the Court in Mr. Mayer's trial testimony and in the Government's Sentencing Memorandum, so

we will not repeat that information here.  Rather, we attempt to offer some explanation and no excuses for Mr. Mayer's actions.  As Mr. Mayer's pastor, Reverend Christopher Powell, aptly explains,  Mr. Mayer "avoided the process of asking himself who he was or what he was becoming.  Because of his education, drive, and the opportunity before him, his failure to ask that question tempted him with earthly riches and an outwardly fabulous but ultimately shallow life."  (Ex. A.)  Mr. Mayer tried to rationalize his actions for a long time, but deep down, he knew that his actions were wrong.  As the Government has noted, once Mr. Mayer acknowledged his guilt and agreed to cooperate, he never once "attempted to dissemble, rationalize, justify, or otherwise explain away innocently his criminal actions or those of his culpable co-defendants." (Government Sentencing Mem. at 4.)  With great sorrow and remorse, Mr. Mayer acknowledges the seriousness of what he has done.

### C.      Guilty Plea, Forfeiture, and Disbarment

On October 19, 2010, accepting full responsibility for his actions, Mr. Mayer pleaded guilty to conspiracy to defraud the United States, 18 U.S.C. § 371, and tax evasion, 26 U.S.C. § 7201.  Mayer's plea agreement is attached as Exhibit B.  At Mr. Mayer's change of plea hearing, after describing in detail the criminal conduct that he engaged in, Mr. Mayer stated: "I am filled with shame and remorse for what I did in J&G's tax shelter practice."  (10/19/10 Tr. at 26:12-13.)

As part of Mr. Mayer's plea agreement with the government, he admitted the indictment's forfeiture allegation with respect to Count One and agreed to forfeit assets valued at over $11.2 million.  Mr. Mayer's plea agreement states: "The forfeiture of the Specific Property shall be in full satisfaction of the defendant's forfeiture obligations."  (Ex. B, Plea Agreement at 2.)  The Court accepted Mr. Mayer's guilty plea on October 19, 2010.

Specifically, Mr. Mayer forfeited funds in various bank and investment accounts totaling over $8.2 million, his family home in Winnetka, Illinois valued at $2 million, and a vacation

home in Green Lake, Wisconsin, valued at $1 million.  In connection with this case, Mr. Mayer disclosed financial accounts worth in excess of $2.5 million to the Government that the Government had not identified in the indictment or in its funds tracing analysis.  As with all eventual cooperation assistance that Mr. Mayer provided to the Government, Mr. Mayer's disclosure of his accounts and assets was scrupulously forthright and honest.

Contemporaneously with Mr. Mayer's plea agreement, the Government entered into a Settlement Agreement with Mr. Mayer's wife, Jennifer Mayer.  Under the agreement, Mrs. Mayer relinquished her rights and claims to the property forfeited under Mr. Mayer's plea agreement, and the Government agreed not to seek further forfeiture of assets apportioned to her. The Settlement Agreement between the Government and Jennifer Mayer is attached as Exhibit C.

As noted by the Government, Mr. Mayer made over $28 million in income for his tax shelter work at Jenkens & Gilchrist.  (*See* Government's Sentencing Mem. at 4.)  In connection with that tax shelter income, Mr. Mayer has made the following approximate payments and forfeitures:

- Federal, state, and real estate taxes: $14.56 million (for the period from 1999 through 2002)

- Assets forfeited under October 19, 2010 plea agreement and settlement agreement: $11.26 million

- Contribution to class action settlement of civil suit against Jenkens & Gilchrist: $1.43 million

- Legal and professional fees paid related to class action defense, IRS civil proceedings, and criminal defense: $2.08 million

In addition, as a result of Mr. Mayer's guilty plea, the Illinois Attorney Registration and Disciplinary Commission opened an investigation into disciplinary charges against Mr. Mayer.

Mr. Mayer voluntarily moved to have his name stricken from the attorney roll, and on May 18, 2011, Mr. Mayer was disbarred on consent.[2]

### D.    Mr. Mayer's Cooperation

Since pleading guilty, Mr. Mayer has provided "extraordinary substantial assistance" to the Government in prosecuting his co-defendants.  (Government's Sentencing Mem. at 2.)  Mr. Mayer testified for a total of 17 days in two trials, more than any other cooperating witness, and underwent extensive cross-examination.  As the only Jenkens & Gilchrist attorney who pleaded guilty and cooperated, Mr. Mayer offered information and testimony that others could not.

Mr. Mayer's credible and persuasive testimony was particularly significant in securing convictions of Paul Daugerdas and Donna Guerin, as well as of David Parse, as discussed in the Government's Sentencing Memorandum.  Mr. Mayer provided detailed testimony about the fraudulent tax shelters, and the role that the defendants played in designing, marketing, and implementing the shelters.  (*Id.* at 8-9.)  Mr. Mayer also identified to the Government a number of transactions involving backdating that the Government itself had not yet uncovered.  (*Id.* at 6.)  Additionally, Mr. Mayer's testimony and unflappable demeanor at the first trial in this matter unquestionably had a major impact on Ms. Guerin's decision to plead guilty after the first trial's verdict was vacated, rather than face another trial with Mr. Mayer as the Government's principal witness.

Mr. Mayer has spent thousands of hours not only preparing for his testimony, but also assisting the Government in other aspects of the case.  In addition to extensive pre-trial

---

[2] *See* Attorney Registration & Disciplinary Commission of the Supreme Court of Illinois, Lawyer Search, *at* https://www.iardc.org/ldetail.asp?id=1010631360.

preparation meetings with the Government in connection with both criminal trials, Mr. Mayer's

work for the Government has included the following:

- Participating in multiple meetings and approximately 40 phone conferences with the Government, including nine separate trips to New York and six meetings in Chicago, involving more than 30 days of face-to-face meetings with Government attorneys and agents over a three-year period.

- Creating an exhaustive chart documenting the tax shelter transactions for hundreds of separate clients, including the client name, client number, bates range in the discovery materials for the tax opinion, the transaction amount, type of transaction, year of transaction, and type of tax loss created.

- Creating a spreadsheet of clients who opened and closed trades within a short period of time, clients who entered into multiple trades to generate the desired tax loss, and clients who engaged in the Section 754 version of the short sale transaction.

- Creating a spreadsheet identifying short sale transactions that began at Altheimer & Gray in 1998 for which Jenkens & Gilchrist wrote opinions, including the client name, dates for certain steps in the transaction, transaction size, gross and net fees, trade gains/losses, and pre-tax economic gains/losses.

- Creating a spreadsheet summarizing all of Ms. Guerin's referral sources, client names and numbers, types of transactions, gross fees received, advisor fees paid, net fees per client transaction, and origination credit allocation percentages between Mr. Daugerdas and Ms. Guerin.

- Creating a spreadsheet of BDO transactions consummated with Jenkens & Gilchrist for purposes of helping the Government determine BDO's penalty in its deferred prosecution agreement.

- Creating a spreadsheet summarizing SWAP transactions, including client names, transaction amount, the tax loss created, year of the transaction, date of the opinion, potential tax loss, gross fee per invoice, advisor fee per invoice, net fee per invoice, SWAP gain/loss, pre-tax economic gain/loss, client originator, and Mr. Daugerdas's fee sharing percentage.

- Creating a spreadsheet summarizing HOMER transactions, including client name and number, transaction amount, gross and net fees paid to Jenkens & Gilchrist, fees paid to Bank One, fees paid to referral sources, and Mr. Daugerdas's fee sharing percentage.

- Revising a spreadsheet summarizing gains and losses from the short option transaction.

- Researching and analyzing documents and databases, telephonic conferences with DOJ-Tax Division counsel, and drafting and editing of affidavit in support of government motion practice in U.S. Court of Federal Claims case regarding William F. Pettinatti and BASR Partnership.

- Researching and analyzing documents and computerized databases, telephonic conference calls with IRS counsel and agents, and preparing data disc containing research results for use in IRS promoter audit.

(*See also* Government's Sentencing Mem. at 7-8.)

As noted above and in the Government's Sentencing Memorandum, Mr. Mayer's assistance has not been limited to helping the Government prepare to prosecute his co-defendants in their criminal case. He has also spent more than 18 days participating in phone conferences and preparation sessions, reviewing documents, and generally assisting the Government in civil cases against taxpayers and promoters. That assistance was "vitally important to the Government in its civil enforcement efforts relating to tax shelter promoters and taxpayers who claimed bogus losses from those shelters." (*Id.* at 9-10.) In fact, Mr. Mayer's assistance to DOJ Tax Civil attorneys "was instrumental and indispensable to the prosecution of that civil tax matter." (*Id.*) That cooperation work is ongoing.

### E.    Mr. Mayer's Current Circumstances

The last 12 years have been extremely difficult for Mr. Mayer. He has had to confront the effects of his actions on himself and, more importantly to him, his family. He has suffered physically and mentally. Mr. Mayer has been able to survive this difficult and lengthy time because of the love and support of family and friends. But he also has to live every day knowing that he has let them down and caused them pain.

Mr. Mayer has not worked since 2005 as a result of the criminal investigation and indictment. His wife, who had stayed home to raise their three sons, suddenly had to re-enter the workforce to provide for their family. Mr. Mayer took on an increased caregiver role, driving his

sons to their various activities, making sure that they did their schoolwork, doing household chores, and providing an in-home presence that was lacking as a result of Mrs. Mayer's return to full-time employment.

Now that his cooperation activities on behalf of the Government are nearing a close, Mr. Mayer hopes to obtain full-time gainful employment as soon as he can, depending on the Court's sentence.  But he is a felon and can no longer practice law or find work in law-related fields. ██

████████████████████████████████████████████████████████

████████████████████████████████████████████████  It will be difficult and take time for Mr. Mayer to find gainful employment, but he is determined to do so.

## II.   LEGAL DISCUSSION

The Court's role is to impose a sentence that is "sufficient, but not greater than necessary" to achieve the goals of sentencing.  *United States v. Booker*, 543 U.S. 220 (2005); *see also United States v. Garcia*, 2014 U.S. Dist. LEXIS 36415 at *15 (S.D.N.Y. Mar. 18, 2014).   In carrying out this role, the Court must consider the following Section 3553(a) factors:  "the nature and circumstances of the offense and the history and characteristics of the defendant," "the need to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for that offense," "the need to afford adequate deterrence," as well as "the need to avoid unwanted sentence disparities" among similarly situated defendants.  *United States v. Cavera,* 550 F.3d 180, 188-89 (2d Cir. 2008).

The Sentencing Guidelines are the "starting point" for sentencing, *Gall v. United States,* 552 U.S. 38, 49 (2007), but the Court "has very wide latitude to decide the proper degree of punishment for an individual offender," *Cavera,* 550 F.3d at 188.  The Guidelines themselves direct courts to consider downward departures when warranted under the facts and circumstances

of the case.   18 U.S.C. § 3553(3).   Indeed, in this case, the Guidelines commit all of the sentencing discretion to the Court because the Government has made a 5K1.1 Motion as part of its Sentencing Memorandum.  *See* Sentencing Guidelines, 5K1.1 Notes ("substantial assistance in the investigation or prosecution of another person who has committed an offense may justify a sentence below a statutorily required minimum sentence").   Therefore, the Court, taking into account Mr. Mayer's extraordinary cooperation, all that he has done to make amends, his current circumstances, and his family's needs, has complete discretion to determine that probation is a just sentence here.

A.     **Mr. Mayer Has Committed Serious Offenses, But He Has Tried To Make Amends Through His Extraordinary Substantial Assistance to the Government's Prosecution.**

Under Section 5K1.1 of the Sentencing Guidelines, the Court should consider a downward departure when a defendant provides "substantial assistance in the investigation or prosecution of another person who has committed an offense."  Federal Sentencing Guidelines Manual § 5K1.1 (2013); Fed. R. Crim. Proc. 35(b).  This Court has long recognized "the practice of granting leniency for cooperation as a 'legitimate governmental practice.'"  *United States v. Milken*, 1992 U.S. Dist. LEXIS 11670, at *3-4 (S.D.N.Y. Aug. 5, 1992) (citations omitted); *see also United States v. Garcia*, 2014 U.S. Dist. LEXIS 36415, at *16 (S.D.N.Y. Mar. 18, 2014).  There is an important practical reason for this tradition—it creates an incentive for those with information to assist the authorities, and thus is a critical tool for law enforcement in the prosecution of criminal conduct.  *Milken*, 1992 U.S. Dist. LEXIS 11670, at *4.

The Court should also consider a defendant's genuine remorse and recognition of responsibility to merit a reduced sentence "because it may indicate a relevant change in the defendant's attitudes."  *Milken*, 1992 U.S. Dist. LEXIS 11670, at *10; *see also Garcia*, 2014

11

U.S. Dist. LEXIS 36415 at *13; *United States v. Marsh*, 820 F. Supp. 2d 320, 368 (E.D.N.Y. 2011).

As reflected in the Government's Sentencing Memorandum, all relevant Guidelines factors demonstrate that a downward departure to probation is warranted here.  These factors are: (1) "the significance and usefulness of the defendant's assistance;" (2) "the truthfulness, completeness and reliability of any information or testimony provided by defendant;" (3) "the nature and extent of the defendant's assistance" and (4) "the timeliness of the defendant's assistance."  Federal Sentencing Guidelines Manual § 5K1.1.[3]

> **1.    Mr. Mayer provided the Government with extraordinary and critical assistance.**

Mr. Mayer was "the most important cooperator in this case."  (Government's Sentencing Mem. at 5.)  Mr. Mayer provided extraordinary assistance to the Government in prosecuting his co-defendants, and in particular Paul Daugerdas and Donna Guerin.  As the only lawyer in Jenkens & Gilchrist's tax shelter practice to plead guilty and cooperate with the Government, Mr. Mayer provided information and testimony that others could not.

His cooperation "proved instrumental to the convictions obtained at trial."  (*Id.* at 5.)  Mr. Mayer's "forthright and unhesitating candor facilitated a seamless transition into his role as a cooperating witness."  (*Id.* at 12.)  Mr. Mayer's testimony helped secure the conviction of Mr. Daugerdas, who was the architect and leader of the tax shelter conspiracy, in two separate trials. Mr. Mayer's testimony against Ms. Guerin was similarly important in securing her conviction at the first trial, and unquestionably contributed to her decision to plead guilty after the Court ordered a retrial.  Mr. Mayer's role in securing Ms. Guerin's plea saved the Court and the

---

[3] The fifth factor, injury suffered or risk of injury as a result of the assistance, is not relevant in this case.

Government time and resources in having to retry her case.  Mr. Mayer also provided important testimony against David Parse.  (*Id.* at 5-8.)

Mr. Mayer's testimony was the longest of any of the cooperating witnesses in this case. He testified for eight days at the first trial, and nine days at the second trial.  At both trials he was cross-examined extensively.  He also performed a crucial role in explaining to the jury, in layman's terms, the workings of the tax shelter transactions, the purpose of the various steps, and the legal concepts at issue.

Mr. Mayer's assistance to the Government was not limited to trial testimony.  Mr. Mayer spent thousands of hours meeting with the Government, participating in phone conferences, creating and reviewing charts and detailed spreadsheets for the various tax shelter transactions, researching discovery materials to support the Government's case, preparing for trial, and testifying.  In addition to his extensive pre-trial preparation sessions in New York for two criminal trials, Mr. Mayer traveled to meet with the Government in New York on nine separate trips, and six more in Chicago, for over 30 days in total over the period of his cooperation.  The work product that he created provided insider insight into the complex tax shelter schemes employed by the conspiracy, and saved valuable Government time and resources.  Mr. Mayer has also spent significant time assisting the Government in civil cases against taxpayers and promoters, and that cooperation has been ongoing.  (*Id.* at 5-11.)

Mr. Mayer's assistance to the Government has been extraordinary and extensive in time and scope.  As the Government has stated in its Sentencing Memorandum, "the time and effort devoted by [Mr.] Mayer . . . were unparalleled in this case and virtually any other white collar prosecution in which the [Government's] attorneys have participated as prosecutors."  (*Id.* at 11.)

### 2.      Mr. Mayer's information was reliable.

As the Government notes in its Sentencing Memorandum, Mr. Mayer's first-hand information was "unquestionably reliable," and served to corroborate the testimony of other cooperators at both trials.  (*Id.* at 11.)  In all of his dealings with the Government, Mr. Mayer has been "100% candid," "meticulous in adhering to his truth-telling obligations," and particularly helpful to the Government "in making cogent and understandable the sometimes abstruse facts and tax principles."  (*Id.* at 4, 7.)  The Government's reliance on Mr. Mayer, as well as the jury's verdicts in both trials, demonstrate Mr. Mayer's credibility as a witness and the truthfulness of his testimony.

### 3.      The nature and extent of Mr. Mayer's assistance was "vast" and "unparalleled."

As noted previously and in the Government's Sentencing Memorandum, Mr. Mayer's cooperation was "vast," and the full body of his cooperation assistance to the Government was "unparalleled."  (*Id.* at 11.)  Mr. Mayer's cooperation was "thorough, complete, and absolutely critical to the successful prosecution of the *Daugerdas* defendants."  (*Id.* at 12.)

### 4.      The information that Mr. Mayer provided was timely.

Mr. Mayer's assistance to the Government was timely.  Mr. Mayer was the first and only lawyer in Jenkens & Gilchrist's tax shelter practice to plead guilty and cooperate.  The timing of Mr. Mayer's plea enabled him not only to testify for the Government at trial, but also to provide significant help in preparing for the Government's trial presentation, as the Government acknowledges in its Sentencing Memorandum.  (*Id.* at 11.)

## B.      A Harsh Sentence Is Not Necessary To Achieve the Sentencing Goals of Punishment and Deterrence.

In considering an appropriate sentence, the Court is charged with determining a sentence that is just right—a sentence that is sufficient, but not greater than necessary.  To do so, the

Court must calculate the need to punish the defendant for his wrongdoing and to deter the defendant from breaking the law, while considering all the facts and circumstances of the case and defendant before the Court.  In this case, we ask the Court to consider the extent to which Mr. Mayer has already made amends for his crimes through the years the case has been pending and through two grueling trials.  The facts show that the sentencing goal of deterrence has largely been satisfied.

### 1.     Mr. Mayer's actions were uncharacteristic.

Mr. Mayer committed serious criminal acts.  Tempted by money and failing to be honest with himself about the path he was on, Mr. Mayer made a series of decisions that have had disastrous consequences in his life.  He has now faced reality, taken full responsibility for those actions, and feels deep shame and remorse.

Apart from the grievous aberration of judgment that led to his participation in the tax shelter scheme, however, Mr. Mayer has led a life of selflessness and devotion to family.  These attributes are exemplified in his relationship with his wife and children, parents, brother, and extended family.  They are reflected in the letters of support that those who know Mr. Mayer best have written to the Court.  Those family and friends know Mr. Mayer as kind, genuine, generous, and caring.  So does his counsel.

### 2.     In light of the circumstances, a probationary sentence in this case would be just, while still reflecting the seriousness of the offense and promoting respect for the law.

Mr. Mayer does not dispute the seriousness of the offense, and has accepted full responsibility for his actions.  He has expressed remorse at every turn, and publicly admitted to his guilt both in his plea and in his extensive testimony.  Since his guilty plea, Mr. Mayer has relentlessly tried to make amends for his wrongdoing by cooperating and assisting the

Government's efforts to prosecute others involved in the conspiracy.  He has provided uniquely substantial and critical assistance to the Government.

We submit that any sentence handed out to Mr. Mayer should take into account the stress and suffering he and his family have already endured as a consequence of his actions.  Mr. Mayer will live with what he has done every day for the rest of his life.  More painfully for Mr. Mayer, so will his family.  He also has been professionally ruined.  After his indictment, he surrendered his law license, and in doing so, gave up his lifelong dream that he worked so hard to achieve.  Mr. Mayer has forfeited assets of over $11.2 million, including his family homes.  The stress of the investigation and prosecution and their consequences and the fact that Mr. Mayer had to prepare and testify in both the original trial and retrial, separated in time by almost two and a half years, have had serious impact on Mr. Mayer's health, as well as the health and well-being of his wife and sons.  Whatever the Court decides to set as a sentence for Mr. Mayer will be punishment above and beyond the suffering he has already experienced.

### 3.  The goals of deterring future criminal conduct and protecting the public from future crimes of the defendant have largely been satisfied.

The likelihood that a defendant will commit future offenses should be considered by the Court in determining the appropriate sentence.  18 U.S.C. § 3553(a); Sentencing Guidelines 4A1.3.  There is no reason to believe that Mr. Mayer will ever break the law again.

Mr. Mayer does not want his criminal conduct to define him.  Prior to his involvement in the tax shelter conspiracy, he led a productive and upstanding life.  Mr. Mayer has no criminal history whatsoever.  As those who know him attest in their letters of support, Mr. Mayer's criminal conduct was a terrible aberration.  Mr. Mayer has accepted full responsibility for his conduct and recognizes the seriousness of his wrongful actions.  He has no intention of committing wrongdoing again, and wants to repair his life.

Mr. Mayer has seen the effects that his actions have had on his children, his wife, his parents, and extended family.  It is evident from his remorse that he will never put those he loves at risk of undergoing this kind of trauma again.   His close-knit family further provides an extensive support system to Mr. Mayer.  The fact that he has so many standing by his side is both evidence of his character and assurance for his future good behavior.  *See, e.g. United States v. Marsh*, 820 F. Supp. 2d 320, 368 (E.D.N.Y. 2011) (imposing a three month sentence for defendant convicted of securities fraud, in part due to the fact that given "the strong support of his family, it is unlikely that the defendant will reoffend").

Additionally, Mr. Mayer can no longer practice law.  He will never be in a position to commit these types of crimes again.  *See, e.g., id.* at 365 (noting that due to the conviction the defendant would no longer be able to practice his chosen career, making him less likely to reoffend).

Finally, studies have shown that recidivism rates decline in older defendants.  U.S. Sentencing Comm'n, *Measuring Recidivism: The Criminal History Computation Of The Federal Sentencing Guidelines*, at 12 (2004).  This Court has recognized that a defendant's advanced age is a relevant factor in determining an appropriate sentence.  In *United States v. Hodges,* the court chose to take the fact that defendant was 43 years old into account, despite the defendant's substantial criminal history, because "recidivism is markedly lower for older defendants." *United States v. Hodges* 2009 U.S. Dist. LEXIS 10683, at *26 (E.D.N.Y. 2009)*; U.S. v. Hernandez,* 2005 U.S. Dist. LEXIS 10026, at *13 (S.D.N.Y. May 24, 2005); *U.S. v. Carmona– Rodriguez,* 2005 U.S. Dist. LEXIS 6254, at *10 (S.D.N.Y. Apr. 11, 2005).  Mr. Mayer is 50 years old and has no criminal history at all.  We ask that the Court consider the low likelihood of recidivism in determining an appropriate sentence for Mr. Mayer.

A court's evaluation of deterrence is not limited to whether an individual defendant is likely to re-offend.   Courts also must consider the public policy-related goal of general deterrence.  18 U.S.C. § 3553(a)(2).  However, that consideration must be balanced against the remaining Section 3553(a) factors and cannot alone outweigh its counterparts.   18 U.S.C. § 3553(a).  In this case, the consequences that have followed Mr. Mayer since his indictment provide a cautionary tale to anyone who may consider following in his footsteps.  He and his co-conspirators—and the numerous other individuals who have been sentenced for tax shelter frauds—have shown to would-be perpetrators that even the brightest minds cannot get away with a scheme of this nature.

**C.    In Determining Mr. Mayer's Sentence, the Court Must Also Consider the Need To Avoid Unwarranted Sentence Disparities Among Similarly Situated Defendants.**

The Court's sentence should avoid creating a disparity in sentencing of similarly situated defendants.   *United States v. Ebbers*, 458 F.3d 110, 129 (2d Cir. 2006) *citing* 18 U.S.C. § 3553(a)(6).  The Government's previous prosecutions of tax-shelter conspiracies at KPMG and Ernst & Young, as well as Mr. Mayer's co-defendants, provide similarly situated individuals to consider for sentencing purposes.  Attached as Exhibit D is a chart prepared by the Government summarizing sentences of cooperating defendants as well as a chart including additional, recent sentences of other cooperating defendants.

With respect to the defendants in this case, the Court has already sentenced a number of cooperating witnesses: Robert Greisman, Charles Bee, and Adrian Dicker.  All three were part of the BDO Seidman team and had offense levels of 40, like Mr. Mayer, and all provided substantial assistance to the government.  Mr. Greisman, a lawyer responsible for selling tax shelters to BDO clients, preparing their tax returns, and responding to audit inquiries, received a sentence of three months imprisonment and three years probation.  Mr. Bee, an accountant who

was considered a leader at BDO Seidman, received a sentence of sixteen months imprisonment. *See* Judgment, Dkt. 28 (6/09/2014) at 2, *United States v. Bee,* No. 09-cr-545 (S.D.N.Y.).   Mr. Dicker, a chartered accountant from the United Kingdom who was a manager of the Tax Solutions Group, received a sentence of ten months imprisonment.   *See* Judgment, Dkt. 35 (6/09/2014) at 2, *United States v. Dicker,* No. 09-cr-238 (S.D.N.Y.).

Cooperating witnesses in other cases, such as Graham Taylor and Belle Six, received probation.   *See* Sentencing Tr. (Apr. 19, 2010) at 16-17, *United States v. Six,* No. 07-cr-547 (S.D.N.Y.); Sentencing Tr. (Dec. 14, 2009), *United States v. Taylor,* No. 08-cr-64 (D. Utah.). Mr. Taylor was an attorney who wrote fraudulent opinion letters for Ernst & Young.   (Ex. D.) Ms. Six promoted the sale of tax shelters while at Ernst & Young and then at an affiliated firm and received $20 million in income related to that work.   (*Id.*)

Other cooperating witnesses have received sentences ranging from probation to one year even where they demonstrated a lack of candor.   For example, Michael Kerekes, a BDO Seidman principal, pleaded guilty in 2009, but was not used as a trial witness due to his dishonesty in early discussions with prosecutors.   His sentence was six months.   *See* Am. Judgment, Dkt. 25 (Jan. 3, 2012), *United States v. Kerekes,* No. 09-cr-137(HB) (S.D.N.Y.)  Peter Cinquegrani, an attorney who wrote fraudulent opinion letters, received only probation despite lying under oath to the Internal Revenue Service.   (Ex. D.)[4]

In contrast, Mr. Mayer provided critical, timely, and truthful testimony and assistance to the Government.   He testified longer than any other cooperating witness in the case, and did more work at the Government's request than did any other witness.   Based on the Government's

---

[4] U.S. Attorney's Office, Press Release, *at* http://www.justice.gov/usao/nys/pressreleases/ September08/cinquegranipleapr.pdf.

respective 5K1.1 submissions in regard to the sentencings of each cooperating defendant in this case, Mr. Mayer's assistance was the most important and effective in securing convictions in this case.

> **D.      In Ordering Restitution, the Court Should Consider Placing a Reduced Burden on Mr. Mayer.**

The purpose of restitution is "essentially compensatory." *United States v. Boccagna,* 450 F.3d 107, 115 (2d Cir. 2006). A court's power to order restitution is limited to actual loss, and a restitution award cannot lead to double recovery. *Id.* at 115, 117. Since the tax losses at issue occurred more than a decade ago, the U.S. Treasury has recouped some portion of those funds. Other defendants, like Mr. Mayer, have forfeited significant sums to the Government. The U.S. Treasury has also recovered a significant amount from individual taxpayers through audits, disclosure and settlement initiatives, and civil litigation. Any restitution order should take into account amounts that the Government has already recovered. *United States v. Cadet*, 664 F.3d 27, 34 (2d Cir. 2011).

In addition, the "manner in which, and the schedule according to which, the restitution is to be paid" can take into account the facts and circumstances of a defendant's financial state. 18 U.S.C. § 3664(f)(2); *see also* 18 U.S.C. § 3664(f)(3)(B) ("A restitution order may direct the defendant to make nominal periodic payments if the court finds from facts on the record that the economic circumstances of the defendant do not allow the payment of any amount of a restitution order, and do not allow for the payment of the full amount of a restitution order in the foreseeable future under any reasonable schedule of payments."). The Court can similarly take into account the defendant's financial state, including the amount of restitution ordered, in determining whether to impose a fine and the amount of any such fine. 18 U.S.C.S. § 3571; *see United States v. Serrano*, 2005 U.S. Dist. LEXIS 9782, at *24-25 (S.D.N.Y May 19, 2005). In

this case, the Court has ordered that defendants be jointly and severally liable for restitution, and has considered the defendants' financial condition and ability to pay in determining payment schedules.   The Court has also imposed no fines or limited fines in light of forfeiture and restitution.  *See e.g.* Sentencing Tr. (Mar. 1, 2013) at 55, *United States v. Guerin,* No. 09-cr-581 (S.D.N.Y.); Sentencing Tr. (June 10, 2014) at 26, *United States v. Greisman,* No. 09-cr-581 (S.D.N.Y.).

Mr. Mayer has already forfeited over $11.2 million to the Government.   Given the criminal investigation and ongoing legal proceedings, Mr. Mayer has not been employed since late 2005.   While Mr. Mayer fully intends to seek gainful employment as soon as sentencing is complete and his sentence discharged, his options will be limited.   He is 50 years old and a felon. He is highly skilled in the areas of accounting and law but unable to work in those fields, and he will be starting over completely.   Any restitution order will add to the financial burden Mr. Mayer currently faces, and make it that much harder for Mr. Mayer to provide for his family and continue to be a productive member of society.   We ask that the Court adopt the restitution methodology it has imposed on other cooperators such as Charles Bee, Adrian Dicker, and Robert Greisman, which amounted to 10% of all future earnings for those defendants (or in the case of Adrian Dicker, $300 per month), and that the Court impose a restitution payment schedule at an appropriately reduced percentage of Mr. Mayer's future income.

## III.   CONCLUSION

Mr. Mayer has pleaded guilty and taken responsibility for his criminal acts.   He feels great remorse and sorrow for what he has done, and he has worked hard to make amends.   Mr. Mayer provided "extraordinary substantial assistance" to the Government that was "unparalleled in this case," and his extraordinary cooperation justifies a downward departure in his sentence.

(Government's Sentencing Mem. at 2, 11.)  For all of the reasons discussed above, we humbly and respectfully request a sentence of probation for Mr. Mayer.


Dated: July 23, 2014                 Respectfully submitted,

Jones Day

By:  /s/ Daniel E. Reidy
       Daniel E. Reidy
       Thomas P. McNulty
       Erin L. Shencopp
       Jones Day
       77 West Wacker
       Chicago, IL  60601-1692
       312.782.3939
       (*admitted pro hac vice*)

       *Counsel for Erwin Mayer*

<u>**CERTIFICATE OF SERVICE**</u>

I certify that on July 23, 2014, a copy of the foregoing document was filed electronically using the Court's CM/ECF system.  Notice of this filing will be sent to all parties by operation of the Court's CM/ECF system.


<u>s/ Daniel E. Reidy</u>
Counsel for Erwin Mayer